John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Tel: (626) 449-8300

Erin Darling, State Bar No. 259724
erin@erindarlinglaw.com
LAW OFFICES OF ERIN DARLING
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California  90010
Tel: (323) 736-2230

Attorneys for Plaintiff Chad Ashby

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD ASHBY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, CHIEF OF POLICE JIM McDONNELL and DOES 1-10,<br><br>　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.　　Plaintiff asserts claims under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

2.　　Plaintiff's claims arise out of a course of conduct involving police officials of the City of Los Angeles, in the County of Los Angeles, State of California, and within this judicial district. Accordingly, venue is appropriate in this Court.

**PARTIES**

3. Plaintiff Chad Ashby is an adult qualified to bring suit.

4. Defendant City of Los Angeles is a public entity subject to suit, and Defendant Los Angeles Police Department (LAPD) is a separate entity subject to suit under binding Ninth Circuit authority. In November 2024 Jim McDonnell was confirmed as the LAPD Chief of Police, and therefore was the final LAPD policymaker during the June 2025 protests from which this claim arises.

5. Does 1-10 are employees of the City of Los Angeles and LAPD who are as of now unnamed because their identities have yet to be ascertained.

6. All Doe defendants acted under color of state law and within the scope of their agency and employment with the City and the LAPD.

**FACTS**

**A.  The LAPD's History of Deliberate Indifference to the Misuse of Kinetic Impact Projectiles At First-Amendment Protected Public Assemblies**

7. Police officers employed by Defendant City and the LAPD have a history of using less-lethal munitions (LLMs), including Kinetic Impact Projectiles (KIPs), against law-abiding people at public assemblies, protests and demonstrations. Despite widespread media attention, lawsuits and court orders, the City's own investigations and reports, remedial policies (ignored in practice), a state law directly on point and POST guidelines the LAPD fires KIPs at peaceful demonstrators, inflicting significant injuries.

8. In one notorious incident outside of Staples Center during the 2000 Democratic National Convention, an LAPD officer shot National Lawyers Guild observer and prominent Southern California civil-rights attorney Carol Sobel in the face with an earlier generation KIP, causing a fracture of facial bones and just missing striking her in an eye. The City ultimately paid out more than $5 million to various plaintiffs and submitted to a court order limiting LLMs to aggressive or combative persons, who should be isolated and arrested when feasible.

9. Despite that court order, at a "May Day" immigration rally at MacArthur Park in 2007, LAPD officers attacked lawful demonstrators with KIPs, hitting members of the media in addition to demonstrators. Liability payouts exceeded $13 million.

10. On May 30, 2020, the LAPD hit at least 12 people in the head with KIPs during a single afternoon of protests over the death of George Floyd. There were similar incidents throughout that summer, including an August 21, 2020 incident in Sunland-Tujunga that resulted in a demonstrator shot in the breast with a "bean bag" from close range, leaving a deforming injury. In response the Los Angeles City Council ordered an investigation and report by independent counsel Gerald Chaleff, who examined the use of three KIPs, the "bean-bag" shotgun (subsequently discontinued), the 37 millimeter (37mm) skip rounds and the 40 millimeter (40mm) baton round.

11. In March 2021, Mr. Chaleff reported that the LAPD's two-hour training on the 40mm is "problematic."

> The dynamics dramatically change in a crowd control situation when the person engaging in the criminal behavior is not standing still. There also may be other people in front, behind or to the side of the intended target. In such cases, the officer operating the 40mm weapon must be very precise in its application to minimize the risk to bystanders. The use of the 40mm weapon to fire at individuals who are in a crowd situation requires well-trained, experienced, and highly skilled individuals. Unfortunately, because of dynamic movement of large, unruly crowds, individuals who are not involved in criminal activity can unintentionally be hit and injured, which is alleged to have occurred during these protests. To be precise takes practice. Of further concern is that the policy from 2017 is silent on the use of the 40mm weapon in crowd control situations.

Mr. Chaleff recommended the LAPD "analyze the use of the 40mm less lethal weapon in situations with large crowds, or ones where people are standing close together, and whether the use of such a weapon should be limited in such situations to individuals

well-trained and experienced, as was the LAPD policy until 2017." Available at:

https://cityclerk.lacity.org/onlinedocs/2020/20-0729_rpt_CLA_03-11-21.pdf

12. Mr. Chaleff made a number of additional findings relevant here:

(a) The majority of reported KIP injuries were the result of 40mm rounds. Many of the victims claimed not to have engaged in hostile acts. Injuries included impacts to the head and neck.

(b) Videos showed officers quickly firing 40mm rounds at distant targets, which increased the likelihood of hitting an unintended target.

(c) The two hours of training was not sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment.

(d) Officers are only required to train once on the 40mm, but using the weapon in public order policing situations requires recurring training and re-certifications.

(e) The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all LAPD officers trained possess the marksmanship skills necessary to competently deploy the weapon under those circumstances.

(f) The LAPD's Use of Force Tactics directive authorizing the 40mm had no detailed guidance on use in public order policing situations.

This report and these findings gave the City, Chief McDonnell and Does 1-10 actual notice that as of the Summer of 2020 the LAPD's policies and training for the use of 40mm projectiles in crowd-control situations were deficient, reckless and negligent, and needed correction to protect innocent people from injury.

13. United States District Judge Consuelo B. Marshall took judicial notice of the Chaleff Report and, informed by other available evidence, enjoined the LAPD in Black *Lives Matters Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM(ASX), 2021 WL 3163309, *4(C.D. Cal. May 10, 2021). The injunction provided:

• LAPD is restricted from using the 40mm . . . in public demonstrations except by officers who are properly trained and certified to use the less-lethal launchers;

• LAPD must give a verbal warning to disperse consist with the LAPD use of force directive and a reasonable opportunity to comply before deploying a 40mm . . . , except when an officer is attacked;

• The 40mm . . . may only be used on persons who pose a threat of serious bodily harm to others, including law enforcement;

• The 40mm launcher must not be used to target the head, neck, face, eyes, or spine of a person; and

• LAPD is restricted from aiming the launchers at the upper bodies of demonstrators.

14.     The State of California enacted Cal. Penal Code § 13652, which provides that "kinetic energy projectiles . . . shall not be used by any law enforcement agency to disperse any assembly, protest, or demonstration" unless "the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, . . . or to bring an objectively dangerous and unlawful situation safely and effectively under control," and each of the following conditions has been met:

(1) De-escalation techniques or other alternatives to force have been
attempted, when objectively reasonable, and have failed.

(2) Repeated, audible announcements are made announcing the intent to
use kinetic energy projectiles . . . and the type to be used, when objectively
reasonable to do so. . . .

(3) Persons are given an objectively reasonable opportunity to disperse
and leave the scene.

(4) An objectively reasonable effort has been made to identify persons
engaged in violent acts and those who are not, and kinetic energy
projectiles or chemical agents are targeted toward those individuals
engaged in violent acts. . . .

(5) Kinetic energy projectiles . . . are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

(6) Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

(7) An objectively reasonable effort has been made to extract individuals in distress.

(8) Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.

(9) Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.

California POST enacted guidelines for crowd management that incorporate the Cal. Penal Code § 13652 provisions as statewide standards for police conduct. Among the POST admonitions is that, when "feasible, law enforcement should identify, isolate and attempt to surgically remove unlawful behavior in an effort to protect lawful assemblies." Following the Chaleff Report and the BLM Injuction, on April 21, 2021, former LAPD Chief Michel Moore disseminated guidelines for KIPs at demonstrations tracking the Injunction, policy that has been ignored in practice.

15.     Plaintiff is informed and believes that Chief McDonnell and the LAPD, with deliberate indifference to the consequences, provided inadequately trained officers inaccurate 40mm launchers to use during the June 2025 demonstrations protesting Trump administration policies and practices. Targeting the 40mm is a "perishable" skill similar to firearms, and requires extensive and ongoing training. Moreover, the LAPD does not have a policy or practice to calibrate the 40mm optical sites before use, despite the fact that inaccurate 40mm launchers create unreasonable risk of serious injury to both intended and unintended targets.

16. With deliberate indifference to the consequences, The City, LAPD, Chief McDonnell and various LAPD employees, including Does 1-10, did not ensure that the officers were adequately trained and the launchers were calibrated to fire accurately. Instead, those Defendants recklessly allowed inaccurate 40mm launchers to be provided to inadequately trained officers  for use at range in crowd control situations without regard to policy, a recipe for disasters that followed.

17. Finally, Defendants City, LAPD and Chief McDonnell knew or should have known that many of the officers equipped with KIPs at the anti-ICE demonstrations support the fascistic Trump administration and its use of military tactics against immigrants and those who come to their defense. City and LAPD supervisors up to and including McDonnell knew, or should have known, that providing officers KIPs without strictly enforcing the guidelines for their use at First-Amendment protected assemblies the constitutional rights, as well as the health and well being of demonstrators such as Plaintiff were put in jeopardy.

**B.     The Shooting of Chad Ashby**

18. On June 6, 2025, military-clad, masked federal agents descended on Los Angeles County areas associated with certain immigrant communities, seizing people violently and without due process. Their outrageous, ham-fisted tactics triggered passionate demonstrations over the following week. Most participants, including Plaintiff, were law abiding. The handful of vandals among them could have been identified, isolated and surgically removed, as required by law to protect the First-Amendment rights of Plaintiff and other law-abiding demonstrators.

19. While the initial demonstrations took place in areas patrolled by the Los Angeles Sheriff's Department, the Los Angeles Civic Center, which includes the area around the federal Roybal Building and Metropolitan Detention Center where ICE detainees were being held under medieval conditions, became a magnet for demonstrators and disproportionate, violent LAPD responses that Chief McDonnell witnessed and allowed to continue unabated over the course of a week.

20.    According to the LAPD's own mandatory disclosures, on June 8, 2025, in the area of Alameda and Temple Streets, the LAPD fired 669 40mm rounds, in addition to 329 37mm discharges, each of which skip-fires three rounds, and 22 smaller FN 303 rounds. On June 9, 10, 11, 12 and 14, the LAPD reported firing another 887 rounds, plus 276 37mm discharges and 214 FN 303 rounds. (These data were not posted timely or broken down by "incident" as required by Cal. Penal Code § 13652.1(b).)

21.    On June 14, 2025, Plaintiff attended the massive "No Kings" demonstration in front of Los Angeles City Hall. Tens of thousands assembled to demonstrate peacefully against policies of the current presidential administration, including the use of ICE agents to kidnap people violently and without due process. Similar demonstrations occurred throughout the United States, with estimates of total participants ranging in the millions.

22.    After 4:00 p.m., as the Los Angeles demonstration was beginning to wind down and some people were leaving, LAPD officers formed scrimmage lines and, without cause, fired tear gas and KIPs at demonstrators. Plaintiff believed he needed to continue peacefully protesting, which he did with thousands of others, amid a great deal of media attention, including multiple television camera crews. Chief McDonnell and other supervisors could literally flip to any local television channel and see LAPD officers indiscriminately firing KIPs at demonstrators and media alike.

23.    By around 7:30 p.m., Plaintiff and other demonstrators had been pushed by the LAPD away from the Civic Center to Broadway between Third and Fourth Streets. Plaintiff had his bicycle, but was not riding it. He was not posing a threat to anyone. He took a brief video of the LAPD advancing in front of the Bradbury Building and then turned around to leave the area eastbound on Fourth Street. After taking about five steps away from the police officers he was struck in the back of the head with what he believes was a 40mm round, lacerating his left ear and causing him to collapse on the street.

24.    Plaintiff was surrounded by people trying to help him. They stood him up and walked him to a nearby alley, Frank Court. Plaintiff was bleeding profusely and remained dazed from the head injury. Someone led him to a civilian medical station, where he was bandaged and medical glue was used to seal the wound. The civilian "medics" instructed him to wait an hour and a half to make sure that his head injury was not getting worse before leaving.

25.    Plaintiff eventually made it to the West Hills emergency room, where he had a CT brain scan and x-ray, which fortunately were negative. He could not get sutures for the laceration, however, because of the glue. He was in the ER for about six hours diagnosed with a concussion. He continues to experience symptoms and now has a scar from the laceration on his left ear.

26.    Plaintiff has healed somewhat, but has a scar, and continues to suffer headaches, trouble with cognition and other neurological deficits. He has follow up visits and will require future care.

## DAMAGES

27.    As a direct and proximate result of the policy and practices of the City and LAPD, and the aforesaid acts and omissions of Chief McDonnell, other City and LAPD employees, and Does 1-10 as alleged in this Complaint, Plaintiff sustained and will continue to sustain great emotional, mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, and apprehension, and loss of enjoyment of life, which have caused, and will continue to cause, Plaintiff to sustain general damages in a sum to be determined at trial.

28.    As a further direct and proximate result of the aforesaid policies and practices of the City and LAPD, and the acts and omissions of Chief McDonnell, other City and LAPD employees and Does 1-10 as alleged in this Complaint, Plaintiff incurred medical expenses, and will in the future incur medical expenses, which have caused, and will cause, Plaintiff to sustain past and future special damages in a sum to be determined at trial.

29. As a further direct and proximate result of the aforesaid policies and practices of the City and LAPD, and acts and omissions of Chief McDonnell, other City and LAPD employees and Does 1-10 as alleged in this Complaint, Plaintiff suffered loss of income, and will in the future incur loss of income, which has caused him, and will in the future cause him, economic damages in a sum to be determined at trial.

30. The aforementioned acts of Chief McDonnell and Does 1-10, were willful, wanton, malicious and oppressive, with reckless disregard for and in deliberate indifference to Plaintiff and his constitutional and statutory rights, entitling Plaintiff to exemplary and punitive damages against Chief McDonnell and Does 1-10, but not against the City and LAPD, which are immune,  in amounts according to proof.

### FIRST CLAIM FOR RELIEF

### INDIVIDUAL LIABILITY– 42 U.S.C. § 1983

(Against Defendants Does)

31. The Doe defendants, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including under the First Amendment to be free from retaliation for engaging in protected speech and activity.

32. The Doe defendants, while acting under color of law, deprived Plaintiff of his civil rights secured by the Constitution and laws of the United States, including his rights under the Fourth Amendment to be free from unreasonable and excessive force, by shooting him in the head with a less-lethal munition without justification and then abandoning him without proper medical attention.

33. As a direct and proximate result of the aforesaid acts and omissions, Plaintiff was injured in his health and person, and will continue to suffer general and special damages as alleged above.

34. The above mentioned Doe defendants acted under color of law, and both separately and in concert. Each Doe defendant failed to intervene to protect Plaintiff

from constitutional violations by one or more other Doe defendant. The aforementioned acts of the Doe defendants, and each of them, were willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Plaintiff of his constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial of this matter.

## SECOND CLAIM FOR RELIEF
## SUPERVISORY LIABILITY – 42 U.S.C. § 1983
(Against Defendants Jim McDonnell and Does)

35.    Defendants Chief Jim McDonnell and Does acted with deliberate indifference, and in conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, and others similarly situated, including the right to be free from retaliation for engaging in protected speech and activity, and the right to be free from unreasonable and excessive force, under the First and Fourth Amendments.

36.    Defendants Chief Jim McDonnell and Does maintained, enforced, tolerated, ratified, permitted, acquiesced in, and applied, among others, the following policies, practices and customs:

(a)    Not adequately training, supervising and controlling officers in the use of KIPs at public gatherings, including the 40 millimeter launchers that were found by United States District Judge Consuelo B. Marshall to have been abused by LAPD in *Black Lives Matters Los Angeles v. City of Los Angeles*, C.D. Cal. Case No. 20-CV-5027 CBM (ASx). (Shooting Plaintiff violated paragraphs 2 and 4 of Judge Marshall's injunction, issued May 10, 2022.)

(b)    Using excessive force, including KIPs, in crowd control situations including peaceful, law abiding individuals such as Plaintiff.

(c)    Failing to train officers to handle usual and recurring situations with which they must deal, including the use of KIPs in crowd control situations, including

-11-
CHAD ASHBY § 1983 COMPLAINT FOR DAMAGES

during encounters with individuals who are engaging in First-Amendment protected activity;

(d)     Failing to require officers to handle usual and recurring situations with which they must deal, including immediately reporting injuring force and summoning necessary medical attention; and

(e)     Other policies, practices and customs as may be established through discovery to have been the moving force or proximate cause of Plaintiff's constitutional deprivations, including failure to train, failure to supervise, and failure to discipline misconduct.

37.     Defendants Jim McDonnell and Does are directly and individually liable in their personal capacity as supervisors. They set in motion a series of acts by subordinates, or knowingly refused to terminate a series of acts by subordinates, that they knew or reasonably should have known would cause the subordinates to deprive Plaintiff of rights protected under the First and Fourth Amendments. Chief McDonnell and Does knew that the subordinates were engaging in these acts and knew or reasonably should have known that the subordinates' conduct would deprive Plaintiff of these rights; and they failed to act to prevent the subordinates from engaging in such conduct. Chief McDonnell and Does disregarded the known or obvious consequence that particular training deficiencies and omission would cause their subordinates to violate Plaintiffs constitutional rights; and that deficiency or omission actually caused the subordinates to deprive Plaintiff of constitutional rights. Chief McDonnell and Does engaged in conduct that showed a reckless and callous indifference to the deprivation by the subordinates of the rights of others. Chief McDonnell's and Does supervisory conduct was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

38.     As a direct and proximate result of the acts and omissions of the aforementioned defendants, Plaintiff was injured in his health and person, and will continue to suffer general and special damages as alleged above.

## THIRD CLAIM FOR RELIEF

## ENTITY LIABILITY – 42 U.S.C. § 1983

(Against Defendants City and LAPD)

39.     Defendants City and LAPD enacted policies and employed practices and customs with deliberate indifference, and in conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, and others similarly situated, including the right to be free from retaliation for engaging in protected speech and activity, and the right to be free from unreasonable and excessive force, under the First and Fourth Amendments.

40.     These practices and customs include longstanding, widespread and well-settled practices and customs regarding the misuse of KIPs at demonstrations that constitutes a standard operating procedure of Defendants City and LAPD. These include repeated constitutional violations that were not properly investigated and for which the violators, and their supervisors, were not disciplined, reprimanded or punished. Defendants City and LAPD maintained, enforced, tolerated, ratified, permitted, acquiesced in, and applied, among others, the following policies, practices and customs:

(a)     Not adequately training, supervising and controlling officers in the use of KIPs at public gatherings, including the 40 millimeter launchers that were found by United States District Judge Consuelo B. Marshall to have been abused by LAPD in *Black Lives Matters Los Angeles v. City of Los Angeles*, C.D. Cal. Case No. 20-CV-5027 CBM (ASx). (Shooting Plaintiff violated paragraphs 2 and 4 of Judge Marshall's injunction, Docket No. 102, issued May 10, 2022.)

(b)     Using excessive force, including KIPs, in crowd control situations including peaceful, law abiding individuals such as Plaintiff.

(c)     Failing to train officers to handle usual and recurring situations with which they must deal, including the use of KIPs in crowd control situations with individuals who are engaging in First-Amendment protected activity;

(d)     Failing to require officers to handle usual and recurring situations with which they must deal, including immediately reporting injuring force honestly and summoning necessary medical attention; and

(e)     Other policies, practices and customs as may be established through discovery to have been the moving force or proximate cause of Plaintiff's constitutional deprivations, including failure to train, failure to supervise, and failure to discipline misconduct.

41.     On January 15, 2026, Judge Marshall found the City and LAPD in contempt of the *Black Lives Matters Los Angeles* injunction.  C.D. Cal. Case No. 20-CV-5027 CBM (ASx), Docket No. 277. Among her findings is that "LAPD shot Chad Ashby in the back of the head with a KIP while Mr. Ashby was trying to leave the protest." Based on this and other incidents, Judge Marshall determined: "Defendants have not demonstrated substantial compliance or that all reasonable steps have been taken to be in compliance with the Court's Preliminary Injunction Order," and therefore banned the LAPD's further "use of 40mm KIPs as a crowd control tool." The City and LAPD are precluded from collaterally challenging these findings in this action. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

42.     As a direct and proximate result of the customs, practices, policies and decisions of Defendants City and LAPD, Plaintiff was injured in his health and person, and will continue to suffer general and special damages as alleged above.

**PRAYER**

WHEREFORE, Plaintiff requests relief as follows, and according to proof, against each defendant:

1. Past and future general damages in amounts according to proof;

2. Past and future special damages, including medical expenses and lost income, in amounts according to proof;

3. Exemplary and punitive damages against Chief McDonnell and Does 1-10 in amounts according to proof;

4. Costs of suit, including prejudgment interest and attorneys' fees under 42 U.S.C. § 1988; and

5. Such other relief as may be warranted or as is just and proper.

Dated:    February 24, 2026        THE LAW OFFICES OF JOHN BURTON
LAW OFFICES OF ERIN DARLING

By: _____/S/ John Burton_____
John Burton
Attorneys for Plaintiff Chad Ashby

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

Dated:    February 24, 2026        THE LAW OFFICES OF JOHN BURTON
LAW OFFICES OF ERIN DARLING

By: _____/S/ John Burton_____
John Burton
Attorneys for Plaintiff Chad Ashby